IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT CHORAK, | ) | CASE NO. 5:15-CV-1938 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.        Introduction

Plaintiff, Robert Chorak ("Chorak"), seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for Disability Insurance Benefits under

Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42

U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be VACATED and the matter be REMANDED for further proceedings consistent

with this Report and Recommendation.

## II.       Procedural History

Plaintiff applied for disability insurance benefits in 2012.  (Tr. 144-149)  Mr. Chorak

alleged his disability began on April 5, 2011.  (Tr. 144)  Mr. Chorak's application was denied

initially on October 29, 2012 (Tr. 90-98) and after reconsideration on March 4, 2013.  (Tr. 101-

107)  On April 30, 2014, Mr. Chorak requested an administrative hearing.  (Tr. 108-109)

A hearing was held before the Administrative Law Judge ("ALJ"), M. Scott Kidd, on

August 20, 2014.  (Tr. 31-62)  The ALJ issued a decision on September 7, 2014, finding that Chorak was not disabled.  (Tr. 12-30)  Chorak requested a review of the hearing decision on October 2, 2014 (Tr. 9-11).  The Appeals Council denied review, rendering the ALJ's September 7, 2014 decision final (Tr. 1-6).

On September 19, 2015, Mr. Chorak filed an appeal of the ALJ's final decision with this court (Doc. 1).  Defendant answered and filed the transcript of the administrative proceedings on November 24, 2015 (Docs. 9 and 10).  Chorak filed his brief on the merits on March 7, 2016 (Doc. 13) and Defendant filed its brief on the merits on April 21, 2016 (Doc. 14), making the matter ripe for this court's review.

## III.   Evidence

### A.  Personal, Educational and Vocational Evidence

Mr. Chorak was born on April 11, 1960 and was 52 years old on the date his application was filed.  (Tr. 144)  He is divorced (Tr. 44) and has one daughter who was 12 years old at the time of the hearing.  (Tr. 37)  Mr. Chorak graduated from high school and took some college courses.  (Tr. 37)  He previously worked as an insurance agent.  (Tr. 23)

### B.  Medical Evidence – Physical Impairments

On February 13, 2012, plaintiff presented to Aultman Hospital with severe right hip pain following a motor vehicle accident, which had occurred approximately one month prior.  (Tr. 252)  Plaintiff's range of motion in his hip was unlimited but did produce pain.  (Tr. 252)  Plaintiff reported pain in his left hip to Dr. Pauskar at an appointment on June 18, 2012.  (Tr. 248)

Plaintiff established care with chiropractor, Dr. Judson Sprandel, in October 2012.  (Tr.

325)  At his initial office visit on October 10, 2012, plaintiff reported left hip, left lumbosacral spinal pain.  (Tr. 325)  Dr. Sprandel noted that plaintiff was ambulating in a slightly guarded manner and presented with a mild left lumbar antalgic tilt. (Tr. 326)  Dr. Sprandel's initial impression was severe traumatic lumbosacral sprain/contusion with severe left hip contusion. (Tr. 326)  Dr. Sprandel completed an "Absence Authorization" form in which he recommended that plaintiff refrain from any employment until October 23, 2012.  (Tr. 324)  At a follow-up appointment on October 17, 2012, plaintiff continued to report significant left lower rib cage pain and lumbosacral spinal pain with dysfunction. (Tr. 327)

Plaintiff presented to Dr. Christopher Stetler, DO, in November 2012.  (Tr. 336)  Plaintiff complained of left hip and mid-back pain.  He reported that sitting, standing and climbing stairs were difficult due to pain.  Plaintiff's history of depression was noted.  Dr. Stetler recommended physical therapy and started plaintiff on Effexor, Naproxen and Omeprazole.  (Tr. 338)  An X-ray image taken October 10, 2012 revealed moderately decreased interosseous spacing at L4-L5, L5-S1, and spurring at L1-L5.  (Tr. 332)

On January 6, 2013, plaintiff reported to Dr. Stetler that he had gone to physical therapy seven times but did not continue going because he was not receiving any benefit. (Tr. 333)  Dr. Stetler's exam revealed normal posture and gait but decreased sensation to plaintiff's lateral thigh.  (Tr. 333-334)

On May 28, 2013, plaintiff presented to Dr. Stetler complaining of back pain.  Dr. Stetler observed a flattened Kyphotic curve and pain on extension of examination. (Tr. 341-342)

Plaintiff began pain management for his thoracic pain at the Crystal Clinic Orthopaedic Center on March 19, 2013.  (Tr. 349)  He complained of low and mid-back pain and arm tingling.  (Tr. 349)  In addition to pain, plaintiff complained of poor circulation, depression and

3

difficulty breathing.  (Tr. 350)  The assessment of plaintiff's impairments was mild, multilevel degenerative changes of the thoracic spine with thoracic pain, mild disc herniation at T2-3 and T5-6 and chronic compression fractures at T-11 to T12.  (Tr. 368)

An MRI of plaintiff's thoracic spine, without contrast, was performed on June 11, 2013. (Tr. 344)  The MRI revealed chronic wedge compression of the T11 and T12 vertebral bodies without significant retropulsion.  There was mild left neural foraminal stenosis.  (Tr. 345)

Plaintiff started treating at the Comprehensive Pain Management Specialists in May.  (Tr. 378, 381, 388-389, 394)  In these records, plaintiff described his pain as a constant, stabbing pain with minimal relief from injections or the Tens unit.  (Tr. 363, 384)  Tenderness to palpation was noted throughout these records.  (Tr. 374, 378, 396)

### C.  Medical Evidence – Mental Impairments

Plaintiff has a history of mental health issues including major depression and panic disorder.  (Tr. 317)  At an office visit at the Internal Medicine Center on October 25, 2011, he reported being extremely anxious and tremulous.  (Tr. 317)  In November 2011, plaintiff complained of increased anxiety, insomnia, tremors and depression.  (Tr. 260)

In January 2012, plaintiff reported continued anxiety to his primary care physician, Dr. Privi Pauskar, M.D.  (Tr. 309)  Dr. Pauskar's notes state that plaintiff had recently taken up a job, but he was unable to function well because of his increased anxiety.  (Tr. 309)  Plaintiff's prescriptions for Effexor and Klonopin were continued.  (Tr. 309)

Plaintiff attended psychological counseling for his depression and anxiety from March 19, 2012 through April 16, 2012.  Records from this treatment report symptoms of anger, irritability, depression and anxiety.  (Tr. 219-243; 271-295)

On June 18, 2012, Dr. Pauskar's notes state that plaintiff had a history of depression but

4

that he is currently on Effexor-XR and is doing very well.  Dr. Pauskar's notes also state that the counseling sessions at the Coleman Center had helped plaintiff tremendously and that plaintiff was working every day.  (Tr. 248)  These notes also indicate that plaintiff was not experiencing any more panic symptoms.  (Tr. 248)  There is no evidence of any mental health treatments after 2012.

### D.  Relevant Opinion Evidence

#### 1.  Treating Physician – Dr. Stetler – January 2014

In a letter to "whom it may concern" dated January 29, 2014, Dr. Stetler stated that plaintiff was limited in his daily activities and that sitting or standing for prolonged periods of time were not achievable due to plaintiff's increased back pain.  Dr. Stetler further stated that plaintiff "states that lifting over 10 lbs. seems to flair [*sic*] the back up as well.  He is limited in bending and stooping due to the back pain."  Dr. Stetler's letter stated that he felt that plaintiff's condition prevented him from being employed. (Tr. 371)

### E.  Testimonial Evidence

#### 1.  Plaintiff's Testimony

A hearing took place in this matter on August 20, 2014.  (Tr. 31)  Mr. Chorak was represented by counsel at the hearing.  (Tr. 31)  Mr. Chorak stated that he lives in a house with his twelve-year old daughter who lives with him half of the time.  (Tr. 37)  He graduated from high school and took some college courses but did not obtain a degree or certification.  (Tr. 37)

A friend drove him to the hearing because the medicine he takes makes him feel dizzy and tired. (Tr. 37-38)  He takes Tramadol and Amitriptyline.  (Tr. 38)  Chorak stated that sometimes the medications provide him relief and sometimes they do not. (Tr. 38)  At the time of the hearing, Mr. Chorak was 5'11" and 200 pounds. (Tr. 38)  He uses a TENS unit a couple of

times a week and wears a back brace when he goes for a walk. (Tr. 38)  On average, he can walk for a couple of blocks.  (Tr. 39)

Mr. Chorak stated that he is not presently working.  (Tr. 39)  He last worked in 2014 for approximately one month at Prestwick Country Club. (Tr. 39)  In 2011, Mr. Chorak drew money out of his 401(k).  (Tr. 40)  In 2012, he earned income from an annuity he prepared, but was self-employed.  (Tr. 40)  Mr. Chorak further explained that he had previously worked for Monumental Life as an insurance salesman for 25 years.  (Tr. 40)  He worked for Monumental Life until 2009 when his job was eliminated due to downsizing.  (Tr. 41)  Mr. Chorak testified that he never had any job performance difficulties while employed with Monumental Life. (Tr. 41)  He stated that this job required a lot of walking and driving but no lifting over 10 pounds. (Tr. 41)

Mr. Chorak testified that he is currently receiving food stamps and cash assistance and does not have any other source of income.  (Tr. 42)  In the past year, Mr. Chorak did not apply for any other work other than at Prestwick Country Club. (Tr. 42)

Mr. Chorak experiences pain in the center of his back.  (Tr. 42)  He testified that he has had three injections.  (Tr. 42)  He also stated that the doctors feel it is too dangerous to operate on his back.  (Tr. 42)  Mr. Chorak testified that the injections provided relief for about a week. (Tr. 42)  When asked if he had tried physical therapy, Mr. Chorak stated that he had tried swimming which provided some relief.  (Tr. 43)  He also stated that massages provide relief to him. (Tr. 43)  Mr. Chorak testified that yard work lasting more than 10 minutes will aggravate his back. (Tr. 43)  Mr. Chorak uses a TENS unit a couple of times a week if someone can hook it up for him. (Tr. 52)  He stated that the TENS unit is helpful to him.  (Tr. 52)

6

Mr. Chorak stated that he receives his medications from his pain management doctor. (Tr. 44)  He explained that the back pain sometimes travels down his left leg.  (Tr. 44)  Mr. Chorak testified that in 2012 he went to Coleman Health for assistance with depression related to a divorce.  (Tr. 44)  In December, 2013, he attended an alcohol detox program. (Tr. 45)  He testified that he has not had any alcohol in nine months and has not used marijuana since last year.  (Tr. 45)

As far as household chores, Mr. Chorak stated that he experiences pain when standing over a counter or stove to cook.  (Tr. 46)  He is able to do dishes but other people help him with his yard work and laundry. (Tr. 46)  Chorak receives help with shopping but he is able to go by himself. (Tr. 46)  In June, 2014, Mr. Chorak and his daughter flew to Chicago and he did not have any difficulty with that trip.  (Tr. 46)

A few months prior to the hearing, Mr. Chorak stated that he tried to play golf twice but could not do so without pain. (Tr. 46-47)  As far as hobbies, Mr. Chorak testified that he likes to read, listen to music and watch sports on television. (Tr. 47)  Mr. Chorak also testified that he does not have any difficulties showering, dressing, bathing or grooming.  (Tr. 47)

Mr. Chorak confirmed he had seen a psychiatrist in 2011 and 2012 for anxiety, depression, insomnia and tremor.  (Tr. 47)  Chorak testified that he continues to get poor sleep. It is unusual for him to get even four hours of sleep per night.  (Tr. 48)  He stated that the Amitriptyline medication helps him to sleep for four hours. (Tr. 48)  Mr. Chorak no longer has issues with tremors.  Regarding his asthma, Mr. Chorak testified that he takes medication and uses an inhaler maybe once a month.  (Tr. 48)  Chorak stated that he has seen Dr. Stetler consistently since 2012.  (Tr. 49)

7

Mr. Chorak testified that he was in too much pain to continue working for the country club.  (Tr. 49)  He believed that performing the duties of that job made his physical symptoms worse. (Tr. 49)  He testified that he gets stiff if he sits more than one half hour.  (Tr. 50)   He also stated he has restricted ability to lift and is afraid he will pop out his back. (Tr. 50)  Chorak testified that he is not comfortable remaining in any position; he has to get up and down.  (Tr. 50)  He will lay down about three or four hours every day and sometimes falls asleep. (Tr. 50-51)  Mr. Chorak explained that fatigue caused from lack of sleep affects his ability to concentrate. (Tr. 51)  He lays out his bills on the kitchen table so he does not forget anything.  (Tr. 51)  Mr. Chorak stated that he is able to follow a television program or read a newspaper article without having poor concentration issues. (Tr. 52)

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE"), Dr. Robert A. Mosley, Ph.D., testified at the hearing.  (Tr. 53-62)  Before Dr. Mosley testified, he asked the ALJ to clarify what type of insurance Mr. Chorak sold.  Mr. Chorak testified that he sold both life and health insurance and occasionally sold annuities.  (Tr. 54)   The VE asked whether this position required Mr. Chorak to sell insurance, explain the policy, or help the clients fill out an application and collect payment.  (Tr. 55)  Mr. Chorak explained that he sold life insurance policies to individuals, usually at their homes.  He stated that the position required follow-up work on underwriting requirements and collecting payments.  (Tr. 55)  The ALJ asked Dr. Mosley whether the annuity work performed by Chorak would fall under the insurance agent position.  (Tr. 56)  In response, Dr. Mosely confirmed that he viewed those as the same types of position. (Tr. 56)

For the first hypothetical question, the VE was instructed to consider a hypothetical individual with the same age, education and work experience as Mr. Chorak.  He was asked to

8

further assume that the individual was restricted to light work with the following limitations: he could occasionally climb ramps, stairs; could never climb ladders, ropes or scaffolds; could frequently balance, stoop, kneel, crouch and crawl; but should avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases. (Tr. 57)  He should also avoid exposure to hazards such as unprotected heights.  (Tr. 57)  The ALJ asked the VE if this hypothetical individual could perform any of the past jobs of Mr. Chorak and the VE opined that he could. (Tr. 57)

For the second hypothetical, the ALJ then added the following limitations: unskilled work with no strict fast pace or strict high production quotas and only frequent interaction with others.  (Tr. 57)  The VE stated that this hypothetical individual could perform work as a cashier II, with 25,000 available in the State of Ohio and over 800,000 available nationally.  (Tr. 57) Additional jobs this individual could perform included:  cafeteria attendant, with 8,000 available in the State of Ohio and 280,000 nationally; and inspector and hand packager with over 6,000 available in the State of Ohio and 100,000 available nationally.  (Tr. 58)

For the third hypothetical, the ALJ limited the hypothetical individual to sedentary work and further required an option to sit and stand at will.  (Tr. 58)  The VE opined that there are unskilled jobs that such a hypothetical individual could perform such as a final assembler, with 6,000 available in the State of Ohio and over 100,000 available nationally; a lens inserter with over 6,000 in the State of Ohio and 100,000 available nationally; and a table worker with over 5,000 available in the State of Ohio and over 100,000 available nationally.  (Tr. 59)  At an unskilled level, the VE testified that it is generally accepted that such an individual could be off task 15 percent of the time and retain the position.  (Tr. 59)  That testimony was based on the VE's personal experience rather than on the DOT.  (Tr. 60)  The VE stated that the DOT does

not address sit/stand options.  (Tr. 60)

The VE testified that Mr. Chorak's past work experience does not transfer to unskilled sedentary jobs.  (Tr. 60)  However, he testified that, if Mr. Chorak's skills transferred to a sedentary job, the position of telephone solicitor would then be available.  (Tr. 60)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.    The ALJ's Decision

The ALJ issued a decision on September 7, 2014.  A summary of his findings is as follows:

1. Chorak meets the insured status requirements of the Social Security Act through December 31, 2016.  (Tr. 17)

2. Chorak has not engaged in substantial gainful activity since the alleged onset date.  (Tr. 17)

3. Chorak has the following severe impairments: asthma and degenerative disc disease of the thoracic spine, without myelopathy and with myofascial pain. (Tr. 17)

11

4.  Chorak does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 14)

5.  Chorak has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may frequently balance, stoop, kneel, crouch, crawl, may occasionally climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to respiratory irritants, such as fumes, odors, dust, gases and poor ventilation and all exposure to workplace hazards, including unprotected heights and dangerous moving machinery. (Tr. 18-19)

6.  Chorak is capable of performing past relevant work as an insurance agent, having a light exertional level designation and a specific vocational preparation factor of six.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  This finding departs from that of the previous decision, based on the residual functional capacity and the testimony of the vocational expert.  (Tr. 23)

7.  Chorak was born on April 11, 1960 and was 50 years old at the time of the alleged disability onset date.  (Tr. 24)

8.  Chorak has a high school education and is able to communicate in English. (Tr. 24)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled whether or not the claimant has transferable job skills. (Tr. 24)

Based on the foregoing, the ALJ determined that Chorak had not been under a disability from April 5, 2011 through September 7, 2014 (the date of the ALJ's decision).  (Tr. 25)

## VI.    Parties' Arguments

Plaintiff filed his brief on the merits on March 7, 2016.  (Doc. 13)  Plaintiff argues that the ALJ erred in failing to consider the plaintiff's mental impairments as severe at step two in his analysis.  Plaintiff argues that the step two severity regulation has been described as a *de minimis* hurdle in the disability process and that the ALJ should have included plaintiff's mental

impairments as severe impairments under his step two analysis. (Doc. 13, p. 5-6)

Plaintiff also argues that the ALJ erred at step four in concluding that plaintiff had the residual functional capacity to perform past work as an insurance agent. (Doc. 13, p. 7)  Plaintiff argues that the ALJ did not consider all the relevant evidence but only focused on the evidence that supported his conclusion.  Plaintiff also argues that the ALJ improperly rejected the opinion of plaintiff's treating physician, Dr. Stetler.  (Doc. 13, p. 10)

Defendant filed a brief on April 21, 2016.  (Doc. 14)  Defendant argues that, because the ALJ determined that some of plaintiff's impairments were severe under his step two analysis, it is of little consequence that he did not include plaintiff's mental impairment as "severe" under step two.  Defendant cites Sixth Circuit case law supporting this argument.  Defendant also points out that the ALJ did not ignore plaintiff's mental impairments but expressly indicated that he had considered them when determining plaintiff's residual functional capacity. (Doc. 15, p. 3-5)

Defendant also contends that the ALJ's residual functional capacity determination was supported by substantial evidence.  (Doc. 14, p. 5-10)  Defendant argues that the ALJ reasonably afforded little weight to the opinion of Dr. Christopher Stetler because it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record.  Defendant argues that the ALJ's reasons for discounting Dr. Stetler's opinion were substantially supported by the record and adequately articulated in his decision. (Doc. 14, p. 5-10)   The undersigned has considered the parties' arguments and makes the recommendation set forth below.

13

## VII.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

14

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B. Step Two Severity Finding

Mr. Chorak argues that the ALJ erred by failing to determine that his mental impairments were "severe" at step two. The severity determination is "a de minimis hurdle in the disability determination process." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1998). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability

regardless of age, education and experience." *Id.* The goal of the test is to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 89 (6th Cir. 1985). However, once an ALJ determines that one of the claimant's impairments are severe, he must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis.  Therefore, the fact that Mr. Chorak's mental impairments were not deemed to be severe at step two could be considered legally irrelevant, if the ALJ considered them in the remaining steps of the sequential analysis. *See Anthony v. Astrue,* 266 Fed. Appx. 451, 457 (6th Cir. Ohio 2008), citing *Mariarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe).

Here, the ALJ determined that plaintiff suffered from severe impairments of asthma and degenerative disc disease of the thoracic spine.  Because the ALJ determined that plaintiff suffered from severe physical impairments, he was required to consider plaintiff's mental impairments in the remaining steps of his analysis, including his assessment of plaintiff's residual functional capacity.  *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x. 181, 2009 U.S. App.LEXIS 19206 (6th Cir. 2009).  However, the only discussion of plaintiff's mental impairments in the ALJ's decision is found at step two of his analysis.  The ALJ states, "[b]ecause the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas, and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." (Tr. 18)  The ALJ then states that, "[a]lthough none of these conditions was found to be severe, I nevertheless, considered their collective existence during formulation of the residual functional capacity.  (Tr. 18)  Despite this statement, there is no indication that the ALJ further considered the mental

impairments in his analysis of plaintiff's residual functional capacity.  The ALJ does not further discuss plaintiff's mental impairments in his decision and there is no indication that the mental impairments were considered in formulating the hypothetical questions to the VE.  For these reasons, the court finds that the ALJ failed to properly analyze the plaintiff's mental impairments in the remaining steps of his analysis, as he was required to do.

### C.  Step Four Finding of Residual Functional Capacity

Mr. Chorak further argues that the ALJ erred in finding that plaintiff retained the residual functional capacity to perform his past work as an insurance agent.  Plaintiff contends that the ALJ selected and discussed only that evidence that favored his ultimate conclusion.  As stated above, after the ALJ determined that plaintiff's mental limitations were not severe, he did not further discuss these impairments or the evidence related to them.  There was evidence in the record establishing that plaintiff had been diagnosed with depression and anxiety and was undergoing counseling.  (Tr. 317, 260, 248, 219-243; 271-295)  Plaintiff was prescribed Effexor.  (Tr. 309, 317, 338)  At the hearing, plaintiff testified that his depression had "cleared up now," but he did not make a similar statement related to his anxiety.  In fact, he testified that he was continuing to take Amitriptyline and that he continued to have troubles with sleep.  (Tr. 47-48)

The court should find that, even if it was irrelevant that the ALJ characterized plaintiff's mental impairments as non-severe at step two, his failure to fully consider the mental impairments in his determination of plaintiff's residual functional capacity, warrants a remand for further proceedings consistent with this report. *See Simpson*, 344 Fed. Appx. at 190-191.

### D.  Treating Physician Rule

Plaintiff also argues that the ALJ did not articulate good reasons for failing to assign

controlling weight to the opinion of plaintiff's treating physician, Dr. Stetler.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation

18

marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole,* 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.

Regarding the opinion of plaintiff's treating physician, the ALJ states,

Little weight was accorded the opinion of the claimant's primary care physician, Christopher Stetler, D.O., that the claimant's condition prevents employment. Dr. Stetler has treated the claimant over a lengthy period and reporting within the

19

> bounds of his professional certifications. However, his opinion violates the
> precepts of SSR 96-5, and is based, as least in part, on the claimant's reports,
> which suggests that Dr. Stetler permitted substitution of the claimant's judgment
> for his own.  In addition, the restrictions as reported are not consistent with other
> records, submitted by specialists.  It is inconsistent with objective exams that
> show mild findings and other clinical exams that show essentially normal
> findings.  On balance, this opinion can be accorded only little weight.

The ALJ was not required to adopt the conclusion of plaintiff's treating physician that plaintiff's

benefits should be continued.  See *Cutlip v. Sec'y of H.H.S.,* 25 F.3d 284, 286-87 (1994).

However, in affording little weight to his opinion regarding plaintiff's limitations in daily

activities, the ALJ was required to support his decision with evidence from the case record which

was sufficiently specific to make clear to any subsequent reviewers the reasons for the weight

given.

The ALJ acknowledges that Dr. Stetler treated plaintiff over a lengthy period.  He then

discounts Dr. Stetler's opinion without pointing to any specific evidence from the record which

contradicts Dr. Stetler's assessments of plaintiff's physical limitations.  The ALJ merely states

that Dr. Stetler's restrictions are not consistent with other records, but he does not make any

specific references to the "other records" which contradict Dr. Stetler's opinion.  Although there

may have been good reasons to reject Dr. Stetler's opinion, the ALJ failed to articulate those

reasons with sufficient specificity so as to allow for meaningful review.  The undersigned

recommends that the court remand this matter for further proceedings consistent with this report.

**VIII.   Conclusion**

For the foregoing reasons, the court should find the decision of the Commissioner was not supported by substantial evidence.  It is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

Dated: June 17, 2016                              *s/ Thomas M. Parker*
                                                  Thomas M. Parker
                                                  United States Magistrate Judge

_____

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**